**AON RISK SERVICES, INC. OF WASHINGTON, D.C., Appellant/Cross–Appellee,**

v.

**ESTATE OF Marshall B. COYNE, et al., Appellees/Cross–Appellant.**

**Nos. 05–CV–38, 05–CV–39.**

District of Columbia Court of Appeals.

Argued Nov. 3, 2006.
Decided Jan. 25, 2007.

Charles B. Wayne, with whom Elisha A. King, Washington, DC, was on the brief, for appellant/cross-appellee.

Wallace A. Christensen, with whom Marc E. Rindner, Washington, DC, was on the brief, for appellees/cross-appellant.

Before WASHINGTON, Chief Judge, and REID and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Marshall Coyne, the owner and president of closely-held Madison Management Corporation ("Madison"), was the insured under a $1 million accidental death policy that Madison purchased from AIG Life Insurance Company ("AIG") through Madison's broker, Aon Risk Services ("Aon"). On August 24, 1999, Mr. Coyne, who was 88 years old at the time, fell while walking across a street and broke his hip. On March 16, 2000, 205 days after his fall, Mr. Coyne died. Madison filed an accidental death claim with AIG.

AIG investigated the cause of Mr. Coyne's death but, on February 26, 2001, ultimately denied Madison's claim on the ground that, under the accidental death policy, benefits could be paid only if the death resulting from an accident occurred within 180 days after the accident, *i.e.*, within a 180–day "incurral period." Thereafter, Madison and the Coyne estate (which hereafter we refer to together as "Madison") sued, claiming that Aon, whose insurance brokerage business entailed procuring appropriate insurance policies on

behalf of its clients, was professionally negligent and breached its contract with Madison by failing to procure for Mr. Coyne an accidental death policy whose terms included the industry-standard 365-day incurral period. A jury found in favor of Madison and awarded damages of $1 million. Madison then requested that the trial judge enter an award of prejudgment interest, but the court denied that request. Both parties appealed.

Aon argues that it was prejudiced by a number of evidentiary rulings by the trial court and by certain comments that the trial court made to or in the presence of the jury. It asks this court to vacate the verdict and judgment, and to order that it be afforded a new trial. Madison argues that the trial court erred in denying its request for prejudgment interest. We deal with each of the arguments in turn and, for the reasons set out below, affirm.

## I. The Court's Evidentiary Rulings and Instructions

Aon argues that Dr. James Lewis should not have been permitted to testify for Madison and that Aon was unfairly prejudiced by Dr. Lewis's testimony, by statements that the trial court made about Dr. Lewis, and by the trial court's ruling precluding Aon from reading into evidence certain deposition testimony by an AIG department head. The pertinent factual background is as follows.

Dr. Lewis is an osteopath/forensic pathologist whom AIG retained to review Mr. Coyne's medical records and to advise AIG as to whether Mr. Coyne's death was caused by his fall and hip injury. In the course of his work, Dr. Lewis consulted with Dr. R. Bruce Heppenstall, an orthopedic surgeon. Dr. Lewis issued a report to AIG stating that the cause of Mr. Coyne's death was "complication of hip

fracture" and that the manner of death was "accidental."

AIG also consulted with its attorneys, who advised it that the Employee Retirement Income Security Act of 1974 ("ERISA") applied to Madison's employee accidental death plan; that, under ERISA, AIG was required to adhere to the plan documents; and that because Mr. Coyne survived 25 days longer than the policy's 180-day incurral period, his death was not an eligible loss and AIG therefore should deny Madison's claim. In a letter to Madison dated February 26, 2001, AIG did deny the claim on that basis.

During the pre-trial discovery period, when Madison disclosed its witness list to counsel for Aon, it included Drs. Lewis and Heppenstall (and counsel for Aon subsequently deposed them). After Madison again listed them (as "fact witnesses who happen to be experts") in its portion of the parties' Joint Pretrial Statement, Aon filed a motion *in limine* seeking to preclude the two doctors from testifying. Aon argued that their testimony would be irrelevant because AIG did not rely on their opinions in denying Madison's claim. Aon also argued that permitting the two doctors to testify would be prejudicial to Aon because their testimony would leave the jury with the erroneous impression that AIG agreed with the two doctors' reports as to the cause of Mr. Coyne's death and considered the death to be accidental (whereas in fact, Aon contends, upon resolving Madison's claim on the basis that Mr. Coyne's death occurred outside the policy incurral period, AIG did not complete its investigation into the cause of Mr. Coyne's death and never decided the issue of causation). Aon argued in addition that the doctors' testimony would amount to expert testimony that should be precluded because the doctors' opinions as to the cause of Mr. Coyne's

death lacked a sufficient factual foundation to be considered competent evidence.

The court denied Aon's motion *in limine,* and Madison called Dr. Lewis to testify at trial. As he was about to testify, the court made the following remarks to the jury: "Just so the jury understands, Dr. Lewis is going to be permitted to testify about his review of medical records in this case and to testify also about whatever opinions he reached in making his report to the insurance company, but he's not been hired as an expert witness by one side or the other." Dr. Lewis testified about the findings he made for AIG. He also testified that AIG had retained him to render opinions on cause of death "hundreds of times" and had never rejected any of his opinions. Dr. Heppenstall did not testify, but, during re-direct examination, Dr. Lewis read a portion of Dr. Heppenstall's deposition testimony into the record including Dr. Heppenstall's statement that "it appears that the fall that this patient experienced and the injury to his hip resulted in gradual deterioration and eventual demise."

Aon sought to read into the record certain deposition testimony by Myra Zimmerman, the manager of AIG's Accidental Death & Dismemberment department, to show that AIG did not rely on Dr. Lewis's and Dr. Heppenstall's opinions. Ms. Zimmerman testified in her deposition that she "was not comfortable that the fracture played a causative role in [Mr. Coyne's] death," that from her "review of the claim, [she] would have gotten more medical opinions ... [f]rom a cardiologist or geriatrics specialist," and that AIG could have denied the Madison claim on medical causation grounds notwithstanding the opinions of Drs. Lewis and Heppenstall. The court precluded Aon from reading the testimony into evidence, observing that Ms. Zimmerman testified as to her hindsight views, and reasoning that her testimony was irrelevant in any event because, under the court's rulings, Madison was not required to prove that AIG would have paid the Madison claim but for the 180–day incurral period.

## II. The Standard of Review

■■■ "The evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court," to which we owe a "great degree of deference," *Jung v. George Washington Univ.,* 875 A.2d 95, 109 (D.C.2005) (citation omitted), because the trial judge is in the "best position ... to weigh probative value against potential prejudice." *Irick v. United States,* 565 A.2d 26, 39–40 (D.C.1989). We do not ask what judgment would have been most wise under the circumstances, but instead limit our inquiry to whether the trial court's rulings were fair and rational. *Taylor v. United States,* 661 A.2d 636, 643 (D.C. 1995) (internal citations and quotations omitted). We will overturn the trial court's rulings only upon a showing of "grave abuse." *Jung,* 875 A.2d at 109.

## III. Analysis of Aon's Arguments

■■ The trial court ruled that, to prevail, Madison would need to prove not only negligence or breach by Aon, but also that Mr. Coyne's accident and resulting hip fracture were the primary or predominant cause of his death (such that coverage would have been available under the accidental death policy but for the 180–day incurral period). In ruling on Aon's motion *in limine* to preclude testimony by Drs. Lewis and Heppenstall, the trial court explained that it was "persuaded that the testimony of Dr. Lewis and the testimony of Dr. Heppenstall was evidence that was probative of the causation issue, without regard to its relationship to the investigation that AIG conducted." The court

therefore ruled that Drs. Lewis and Heppenstall would be permitted to testify as to "what they did for AIG in reviewing the records and as to any opinions or conclusions that they drew in that process." Because "[e]vidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Plummer v. United States*, 813 A.2d 182, 188 (D.C.2002) (citation and internal quotations omitted), we have no trouble agreeing with the trial court that Dr. Lewis's testimony and Dr. Heppenstall's report were relevant to the central issue of the cause of Mr. Coyne's death, regardless of whether AIG relied on the doctors' opinions in denying Madison's claim. We therefore reject Aon's argument that the court should have excluded Dr. Lewis's testimony and Dr. Heppenstall's report as irrelevant.

■ Aon next complains that "Dr. Lewis voiced opinions that were nowhere to be found in [Dr. Heppenstall's] report or in [Dr. Lewis's] own report for AIG."[1] However, Aon did not elicit any testimony (as it might have done on *voir dire*) showing that the opinions to which Dr. Lewis testified were anything other than opinions that he arrived at during the course of his work for AIG. And even though Madison did not list Dr. Lewis on its Superior Court Civil Rule 26(b)(4) expert witness disclosure statement[2] (and he therefore was not permitted to testify to any facts and opinions that he "acquired or developed in anticipation of litigation or for trial," *id.*), it was permissible for Dr. Lewis to testify as an expert about opinions that he developed as "an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit." *Adkins v. Morton*, 494 A.2d 652, 657 (D.C.1985), quoting Fed.R.Civ.P. 26(b)(4) advisory committee's note; *see also Gubbins v. Hurson*, 885 A.2d 269, 277 (D.C.2005) (Rule 26(b)(4) "focuses not on the status of the witness, but rather on the substance of the testimony") (citation omitted); *Abbey v. Jackson*, 483 A.2d 330, 334–35 (D.C.1984) (plaintiff could question doctors as experts despite the failure to list them under Rule 26(b)(4) because "their expertise ... was not developed in anticipation of litigation"). Because Dr. Lewis testified that he had been "saying the same thing over [and over]" as to why Mr. Coyne died, and because there was no evidence that the analysis that Dr. Lewis discussed during his testimony reflected an opinion that he developed only for trial or in anticipation of litigation, we can find no error in his having been permitted to explain in detail the reasoning behind the opinion that he gave to AIG.[3] *Cf. District*

1. Aon pursued this point on cross-examination, asking Dr. Lewis whether it was "fair to say" that his report to AIG contained none of the analysis that he presented during his testimony on direct examination and pointing out that the report to AIG did not contain "any of the detail other than the conclusion that you have given us here today."

2. Rule 26(b)(4) provides in pertinent part:
   (4) Trial preparations: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this Rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
   (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

3. We agree with Aon, and with the conclusion that the trial court eventually reached, that Dr. Lewis did testify as an expert. *The court*

*of Columbia v. Howard*, 588 A.2d 683, 692–93 (D.C.1991) (trial court erred in not allowing physician who had treated decedent Howard, and who was not listed on Rule 26(b)(4) statement, to "testify about the opinions he formed as a result of treating Mr. Howard on the mechanism of injury and on the types of incidents that could have caused the fracture suffered by Mr. Howard," where the physician "indicated that he always tried to determine mechanism of injury in the course of treating his patients").

Citing *Gregory v. Greater Southeast Comm. Hosp. Corp.*, 697 A.2d 1221 (D.C. 1997) (holding that the trial court erred when it did not direct a verdict in defendant's favor when the plaintiff's medical expert admitted that his opinion on cause of death was made without the benefit of the decedent's complete medical records), Aon further argued in its brief that the jury should not have been permitted to hear the expert opinions of Drs. Lewis and Heppenstall because the two doctors failed to review Mr. Coyne's complete medical records and did not consult with his cardiologist. The analogy to *Gregory* is weak, because, unlike the expert witness in *Gregory*, Dr. Lewis stated that he believed he

had all the records he needed to opine with medical certainty.[4] Nevertheless, we initially understood Aon's contention to be a more general one that the trial court failed adequately to perform its "gatekeeping" function, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), by admitting expert testimony for which there was not a reliable foundation. Because, at oral argument, Aon's counsel disclaimed any such contention, we need not address it here. We note in any event, however, that because there is no claim that Dr. Lewis relied on anything other than the type of data that experts in his field (forensic pathology) reasonably rely on in forming medical opinions, *see In re Melton*, 597 A.2d 892, 901 (D.C.1991), a sufficient answer to such a "gatekeeping" argument would be that Aon's counsel had the opportunity to cross-examine Dr. Lewis—and did cross-examine him—about the claimed flaw in his and Dr. Heppenstall's preparation.[5] *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 ("vigorous cross-examination ... [is] the traditional and appropriate means of attacking shaky but admissible evidence"); *see also In re Melton*, 597

initially ruled that Dr. Lewis did not need to be proffered as an expert, but, as subsequent Madison witness Dr. Richard Conant was about to testify, told the jury: "Please remember the instruction I gave you yesterday during Dr. Lewis's testimony as to how you are to consider the testimony of an expert witness. That same instruction will apply to Dr. Conant...." The court later commented that its "single biggest remaining concern [was] ... that I perhaps should have viewed [Drs. Lewis and Heppenstall] all along as ... additional expert witnesses, that I have said something to the jury to suggest that they were something other than expert witnesses. Or to suggest that Doctor Lewis was something other than an expert witness." We think, however, that Dr. Lewis's status as an expert did not call for the court to do anything more than it did. An "expert whose information was not

acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit ... should be treated as an ordinary witness." Fed.R.Civ.P. 26(b)(4) advisory committee's note.

4. Dr. Lewis testified repeatedly to the effect that, "I don't think we needed any additional records."

5. We note that, during the cross-examination, Aon's counsel did not confront Dr. Lewis with Dr. Heppenstall's agreement, during his deposition, that a cardiologist would be "the more appropriate doctor to comment on" whether Mr. Coyne's pre-fall heart condition and other conditions contributed to his death.

A.2d at 903 ("the court should accord an expert wide latitude in choosing the sources on which to base his or her opinions" and "may not substitute his or her judgment for the expert's as to what data are sufficiently reliable, provided that such reliance falls within the bounds of reasonableness"); *Boyar v. Korean Air Lines Co., Ltd.*, 954 F.Supp. 4, 7 (D.D.C.1996) (it is not proper to exclude expert testimony "merely because the factual bases for an expert's opinion are weak") (citation omitted).

▮ We also reject Aon's argument that it was unfairly prejudiced by Dr. Lewis' testimony and by the trial court's comments about Dr. Lewis. Aon was not prejudiced procedurally because, as the trial court explained, whether or not Dr. Lewis testified as an expert and despite his non-inclusion in Madison's Rule 26(b)(4) statement, Aon had been fully on notice for months that Madison intended to call Dr. Lewis, had copies of his and Dr. Heppenstall's reports, deposed both doctors, and knew what Dr. Lewis would say at trial. As to the potential prejudice to Aon from the court's comment that Dr. Lewis had "not been hired as an expert witness by one side or the other"—which Aon argues amounted to the court's vouching for Dr. Lewis' credibility as an independent expert—we think that the statement by Madison's counsel during closing argument was sufficient to counteract any unfair prejudicial effect. Referring to Dr. Lewis, Madison's counsel told the jury, "[w]e paid for his travel expenses to come down here and we paid for his time on the stand. I just want to make sure you understand that."

Although Aon complains of the prejudicial effect of Dr. Lewis's testimony that AIG had sought his medical opinions "hundreds of times" and never rejected his opinions, we think the real prejudice to Aon was from the succinct and graphic testimony by Dr. Lewis (incorporating the opinion of Dr. Heppenstall), supported by the testimony of Madison's other medical expert, Dr. Conant—which testimony, it appears to us, was not sufficiently counter-balanced by the testimony of Aon's expert, cardiologist Dr. Nicholas Fortuin. Dr. Lewis provided an explanation that connected the injury from a broken hip to the condition known as "failure to thrive" (a condition listed on Mr. Coyne's death certificate as a "significant contributing condition").[6] Similarly, Dr. Conant testified that there exists a documented correlation between hip fractures and death in the elderly, that a frequent result of hip fractures in elderly patients is failure-to-thrive syndrome, and that this medical phenomenon has been confirmed by his own clinical experience. By contrast, as the trial judge observed, Aon's witness Dr. Fortuin repeatedly "got in a tight spot." Dr. Fortuin also testified to his lack of familiarity with the literature on failure to thrive; acknowledged the limited basis that the physician whose name appears on Mr. Coyne's

---

6. Dr. Lewis said:
   "I believe [Mr. Coyne] showed almost the exact pathology of a person who fractures their hip and once you fracture your hip, the bone marrow is exposed and some of the bone marrow and the substances in the bone marrow can go into your bloodstream. That's called fatty emboli and when that goes into your bloodstream it goes to three places, your lung, so you develop a pneumonia type situation. It goes to your kidneys, so your kidneys start to kind of fail, but most important it goes to your brain. When it goes to your brain, you start to have things like confusion. You start to not be able to—lethargy, not to be able to take care for yourself, inanition, the whole process as seen in this case. It happens so many times before I have observed. So that's what I think happened to Mr. Coyne."

death certificate had for concluding that the primary causes of his death were cardiac arrhythmia and coronary artery disease; and resorted to the explanation that he did not have all the records that he would liked to have seen.

As the trial court implied, an imbalance in the evidence existed in part because Aon "never made any request of me to—for leave to name another expert so that the numbers would be even."[7] But even if Aon may have been prejudiced by the imbalance in the evidence that existed because Dr. Lewis was permitted to testify as an expert in support of Madison's case, such potential prejudice is not the type of prejudice that would have warranted exclusion of Dr. Lewis's testimony. *See, e.g., Westfield Ins. Co. v. Harris*, 134 F.3d 608, 613 (4th Cir.1998) (fact that testimony "might be given 'much credibility' by the jury or that it might 'bolster' a similar opinion ... [is] not grounds to exclude the evidence" because it "is not the type of 'prejudice' that is envisioned by Federal Rule of Evidence 403").

Aon did seek to counterbalance the opinions of Drs. Lewis and Heppenstall with testimony by AIG department manager Zimmerman, testimony that Aon argued would establish that AIG did not view the medical inquiry as complete and would have sought further medical opinions if it had not relied on the incurral period to deny Madison's claim. Aon feared that, in the absence of Ms. Zimmerman's testimony, Dr. Lewis's testimony would leave the jury with the impression that AIG would have paid Madison's claim but for the 180–day incurral period, and would lead the jury to rule in Madison's favor on that basis alone. We agree with the trial judge, however, that hindsight testimony from Ms. Zimmerman about what AIG might have done differently was not really relevant.[8] *Cf. Snowden v. Lumbermens Mut. Cas. Co.*, 358 F.Supp.2d 1125, 1128–29 (N.D.Fla.2003) (uncorroborated hindsight testimony by policyholder that it would have accepted a settlement within policy limits if offered by the insurer

7. The court also commented that "it is unimaginable to me that I would have denied such a request had it been made." We, too, note that even though Aon argues strenuously that the opinion of a geriatrics expert (which opinion Aon presumes would have supported its position) might have been obtained had AIG not denied Madison's claim on the basis of the 180–day incurral period, Aon did not seek to add a geriatrics expert of its own to its witness list.

8. The trial court characterized the testimony by Ms. Zimmerman that Aon sought to introduce as follows:

"Three years later, she says now looking back, reviewing the file in preparation for my deposition, I think we should have ... denied the claim on every ground available to us.... [T]here is no evidence that she directed the claims representative to obtain more opinions or to do anything other than the claims representative recommended, which was that the claim be denied on the one ground alone, which was the 180 incur-

ral period.... But now what she is saying is, ... If I got the legal opinion now, three years later in a case like this, what I would do is, I would say, okay, great, that's one way to deny this claim. Now let's look for a second way. And that's what she is saying. But she clearly didn't do that three years ago, because if she had, we would know about it."

Aon complains that, by contrast, Madison was permitted to read into evidence a portion of the deposition testimony by an AIG underwriter, Lloyd Young, who responded to questions about whether AIG would have agreed to revise Mr. Coyne's accidental death policy to include a 365–day incurral period if it had been asked by Aon to do so when the policy was up for renewal. Mr. Lloyd's testimony, too, arguably was speculative (though partially supported by testimony that AIG did in fact issue policies with 365–day incurral periods). It appears, however, that Aon did not seek to exclude Mr. Lloyd's testimony on that basis.

would be speculative and of little value). We also think the trial judge was correct in ruling that the way to counteract any danger that the jury would rule in Madison's favor on the basis of improper reasoning was an instruction that the jury was permitted to find in Madison's favor only if it concluded that the fall and resultant hip injury were the predominant cause of Mr. Coyne's death. The trial court gave that very instruction,[9] and we are persuaded that it was enough to avert the potential prejudice that Aon describes.

In sum, we are satisfied that the trial court did not abuse its discretion in making the evidentiary rulings of which Aon complains.

### IV. Prejudgment Interest

■ In filing its post-verdict motion for pre-judgment interest, Madison relied on D.C.Code § 15–108. Section 15–108 provides, in pertinent part, that "[i]n an action ... to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid." Thus, one requirement that must be met to trigger the statutory mandate

for an award of prejudgment interest under § 15–108 is that the action be one to recover a "liquidated debt."[10] *Athridge v. Iglesias,* 382 F.Supp.2d 42, 49 (D.D.C. 2005). We agree with the trial court that Madison was not entitled to prejudgment interest because Aon "owed no 'liquidated debt'—or any other kind of debt—to the plaintiffs until the Court's entry of judgment on October 21, 2004."[11]

■ "A liquidated debt is one which at the time it arose ... was an easily ascertainable sum certain." *District of Columbia v. Pierce Assoc., Inc.,* 527 A.2d 306, 311 (D.C.1987) (citation and internal quotations omitted). Madison argues that a liquidated debt was involved here because its claim was for the face amount of the accidental death policy, $1 million. From the outset, however, one of Aon's defenses was that "[h]ad Aon insisted on [purchasing a policy with] a 365–day incurral period, as plaintiffs assert should have happened, it is virtually certain that AIG would have sought to reduce its exposure by reducing the policy limits as they applied to Mr. Coyne." Aon also presented trial testimony to that effect by an insurance brokerage expert (and Madison's counsel argued

9. The court instructed the jury that
"[t]o prove their damages under either or both of these two causes of action, the plaintiffs must prove by a preponderance of the evidence that they would have been legally entitled to benefits under Madison's accidental death insurance policy were it not for Aon's breach of contract and/or professional negligence.... To prove that they would have been legally entitled to benefits under the insurance policy, the plaintiffs must prove that the accidental injury suffered by Mr. Coyne was the proximate cause of his death.... Finally, you must understand that *the issue before you for decision is not whether AIG would or would not have paid the claim had the policy contained a 365–day incurral period. The plaintiffs must prove that they would have*

*been legally entitled to benefits under the policy, regardless of AIG's position on the matter*" (emphasis added).

10. Madison explicitly does not rely on D.C.Code § 15–109, which leaves a jury or court free to include interest "as an element in the damages awarded, if necessary to fully compensate the plaintiff," and does not specify a "liquidated debt" requirement.

11. Because our resolution of the "liquidated debt" question disposes of the pre-judgment interest issue, we do not reach the issue of whether the type of debt involved in this case is one on which interest was "payable by contract or by law or usage." D.C.Code § 15–108.

the point vigorously in his closing statement). We think this asserted defense and testimony created at least a reasonable controversy as to the amount for which Aon would be liable if Madison prevailed, and was enough to make Madison's claim a claim for an amount that was not easily ascertainable. *See Pierre. Equip. Co., Inc. v. Griffith Consumers Co.,* 831 A.2d 1036, 1041 (D.C.2003) (where plaintiff brought an action for contribution to compel the defendant to participate in a settlement payment of $850,000, and the jury ultimately held that plaintiff was entitled to $600,000 in contribution, defendant's debt was unliquidated, because there was no sum certain until after the jury returned its verdict); *see also United States Fire Ins. Co. v. C & C Beauty Sales, Inc.,* 674 So.2d 169, 171–72 (Ct.App.Fla.1996) ("[d]amages are liquidated when the proper amount to be awarded can be determined with exactness from the cause of action as pleaded, *i.e.,* from a pleaded agreement between parties, by an arithmetical calculation or by application of definite rules of law.... However, damages are not liquidated if the ascertainment of their exact sum requires the taking of testimony to ascertain facts upon which to base a value judgment"). Accordingly, we affirm the trial court's ruling denying prejudgment interest.

*So ordered.*